IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LYNDA GARCIA,

    Plaintiff,

v.                              Civ. No. 11-0119 ACT/WDS

METROPOLITAN LIFE INSURANCE CO.,
PAUL REVERE LIFE INSURANCE
COMPANY, and UNUM GROUP,

    Defendants

**MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court on Defendants' Motion for Partial Summary Judgment [Doc. 45].  Plaintiff submitted her Response [Doc. 61] and Defendants submitted their Reply [Doc.62].   For the reasons set forth below, the motion is granted.

Count II of  Plaintiff's Second Amended Complaint [Doc. 32] asserts that Defendants[1] cancelled Plaintiff's liability policy in bad faith.  Defendants' Motion for Partial Summary Judgment contends that, as a matter of law, the Court should find that MetLife did not act in bad faith when it terminated coverage and suspended payments.

**Factual Background**

Plaintiff Lynda Garcia  is an orthodontist with a disability policy issued by MetLife.  She received disability payments from 2004 until 2010, when MetLife stated it would  discontinue her

---

[1]  "Defendants" are, collectively, Metropolitan Life Insurance Company, Paul Revere Life Insurance Company, and UNUM Group.  Individually they are referred to as MetLife, Paul Revere and UNUM.  Plaintiff's policy was originally issued by New England Mutual Life Insurance Company, which contracted with Paul Revere to administer claims under disability policies.  When MetLife and New England merged in 1996, MetLife became the primary insurer.  (Doc. 45 at 1). UNUM is the parent company of Paul Revere.  (Doc. 30 at 6).  It is unclear whether UNUM provides employees to Paul Revere to administer claims.  *Id.*  Nevertheless, the Court allowed Plaintiff to submit her Second Amended Complaint to add both Paul Revere and UNUM as defendants to this action.  (Doc. 30).

disability payments after Paul Revere, the claims administrator, determined she was no longer entitled to benefits.

Garcia made her disability claim in 2004 for "chronic cluster headaches and depression." Her treating physician was Harvey Featherstone, M.D. who confirmed that Plaintiff's severe headaches began in 1994. Defendants' Motion for Partial Summary Judgment, ¶¶ 5-7.

Dr. Featherstone diagnosed Plaintiff with "chronic cluster-type headaches." "Dr. Featherstone indicated that Garcia suffered from 'chronic pain, sedation, poor memory, and tremor[.]' Id. at ¶ 7. Plaintiff also submitted records from a psychiatrist, Harold Alexander, M.D., who diagnosed Plaintiff with a major depressive disorder (single episode) and acute Post Traumatic Stress Syndrome. Dr. Alexander stated that Plaintiff's condition resulted from her husband's being sent to prison. Id. at ¶ 8.[2] In addition, Plaintiff herself was placed on probation by the New Mexico Board of Dentistry for illegally self-prescribing opiate pain medication. Finally, Plaintiff and her father listed their practice for sale and sold their group practice in 2004.

Based on the medical reports, MetLife began paying benefits to Plaintiff in 2004. In 2008, a new Paul Revere claims representative, Bruce Lacasse ("Lacasse"), took over Plaintiff's claim file. In 2009, he received a Supplemental Statement from Plaintiff who described her current activities as "limited, mainly household, reading, [and] short slow walks." Id. at ¶ 9. Dr. Featherstone had restricted Plaintiff from "any activity." Id. This restriction essentially meant that Plaintiff was homebound. Id. at ¶ 12.

In 2009, Lacasse requested an independent activities check and Plaintiff was observed "leaving her house, unloading items from a Suburban at a senior living complex and playing the

---

[2] In 2003, Plaintiff's husband was arrested, pled guilty, and was sentenced to prison for inappropriate sexual conduct with one of the couple's adopted daughters.

guitar, outdoors, at the complex." *Id*. at ¶ 15.   This was the first time that Paul Revere learned Plaintiff was performing with a band. *Id*.   Subsequent surveillance indicated that Plaintiff performed several times with the band. *Id*. at ¶¶ 16-17.

In 2009, Dr. Featherstone retired and Plaintiff began seeing a new physician, Pamela Black, M.D. *Id*. at ¶ 18.   On October 5, 2009, one day after Plaintiff had been observed playing with the band for two days at an outdoor concert, Plaintiff submitted a Supplemental Statement listing her current activities as "mostly home, very light housekeeping on good days, I read, short walks, limited driving ability, one 30 minute bike ride 2 weeks ago." *Id*. at ¶ 20.  On October 13, 2009 Paul Revere received  Dr. Black's first evaluation of Plaintiff's status.  She limited Plaintiff to "no repetitive motions, no static position" and provided a diagnosis of nonspecific neck pain. *Id*. at  ¶ 21.   When Lacasse inquired as to her daily activities, Plaintiff said she wasn't able to watch TV or use a computer because it hurt too much.  She did not mention her activities with the band. *Id*. at ¶ 18.

Subsequent reviews by case workers and medical personnel indicated that Dr. Featherstone's restrictions and limitations were inconsistent with Plaintiff's actual activities. *Id*. at ¶¶ 22-25.  After the surveillance, Defendants had several clinical reviews of Plaintiffs file.  On October 22, 2009, Deb Donahue, R.N.  reviewed the medical file and the surveillance video and could not make a determination that Plaintiff was functionally limited.  She attempted to contact Dr. Black on two occasions but did not receive a response. *Id*. at ¶ 23.

Also in October, 2009, Plaintiff's file was reviewed by Linda Cowell, M.D., a board-certified neurologist.  Dr. Cowell had reviewed Plaintiff's file when Dr. Featherstone was her treating physician.  Dr. Cowell now noted that Plaintiff's restrictions and limitations were not supported.  That is, Dr. Cowell found that the surveillance information was inconsistent with a diagnosis of

severe chronic daily headache syndrom. *Id*. at ¶ 24.  Dr. Cowell attempted to reach Dr. Black but received no response.  *Id*. at ¶ 25.  She wrote to Dr. Black with specific questions, but received no response.  *Id*.  Dr. Black did, however, submit her evaluation which merely repeated her earlier diagnosis.  *Id.*   Given the lack of response from Dr. Black,  Plaintiff's file was turned over to another physician for a complete review.  *Id*.

Alan Neuren, M.D., a board-certified neurologist and psychiatrist reviewed Plaintiff's file and submitted his report on December 9, 2009.   He noted that Plaintiff's claimed impairment was completely self-reported and there was no way of validating her complaints:  "one has to rely on the veracity of the individual making the complaint."  *Id*. at ¶ 26.  He concluded that:

> The constellation of findings would indicate there is no physical basis for the insured's complaints and that she is fully capable of functioning without restrictions or limitations.

*Id*.

On January 27, 2010, after a complete review of the file, Lacasse recommended that Plaintiff's claim was no longer compensable.  Plaintiff was notified that benefits were no longer payable.  *Id*. at ¶¶ 27-28.

## The Policy Provisions

The MetLife Policy issued to Plaintiff provides in pertinent part:

> "Total disability" means that because of Injury or Sickness:
>
> a.   You are unable to perform the important duties of Your Occupation; and
>
> b.   You are under the regular and personal care of a Physician.

*Id*. at ¶ 1.

With respect to the continuation of benefits, the Policy provides:  "We will pay at the end of each 30 days any benefits due that are payable periodically - subject to continuing proof of loss. *Id*. at ¶ 2.

### Standard for Summary Judgment

Summary judgment is appropriate only in cases where, looking at the facts in the light most favorable to the non-moving party, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); Fed.R.Civ.P. 56©.  An issue of fact is "genuine" if there is sufficient evidence so that a rational trier of fact could find for the non-movant.  *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  "An issue of fact is 'material if, under the substantive law, it is essential to the proper disposition of the claim.'"  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).  The burden is on the movant to show there is an absence of evidence to support the non-moving party's case.  *Celotex*, 477 U.S. at 325.

### Discussion

Plaintiff does not dispute any of the foregoing facts.  *See* <u>Response</u> at 6.  Plaintiff submits her "Additional Relevant Facts," *see* <u>Response</u> at 6-13, ¶¶ 1-21, which are in reality arguments concerning the inferences to be drawn from the undisputed facts.  For example, being able to perform in a band, she argues, does not indicate that she can practice her profession.  She cites to Dr. Neuren's opinion that she is not impaired, but argues that he did not consider whether she can practice her profession as an orthodontist.  *Id*. at ¶ 4.  She also notes the testimony of Lacasse, who "acknowledges that being out in the community, driving and playing in the band do not show that someone can be an orthodontist full-time."  *Id*. at ¶ 5.

5

Plaintiff notes that if she returned to work, she would once again suffer from her cluster headaches.  She needs a flexible schedule to accommodate her disability and has been unable to find such employment.  She cites to a psychiatric IME ordered by UNUM to determine her ability to return to work.  The psychiatrist "noted that [Plaintiff's] symptoms would increase substantially under stress and that the prognosis for regaining full function is poor to fair.  He indicated that any return to work would have to be gradual, starting with two hours a day, four days a week."  *Id*. at ¶ 16.  Defendants objected to and/or disputed all but the first Additional Relevant Facts sbumitted by Plaintiff.

Defendant requests summary judgment on the following issues:  (1) MetLife, while responsible for any benefits deemed owing under the policy, was not the entity that was involved in the investigation of Garcia's disability; (2) all Defendants are entitled to summary judgment on Plaintiff's bad faith claim; and (3) Plaintiff cannot recover future damages under the liability policy.  Because the Court agrees with the second ground, it does not address ground one.  Plaintiff made no arguments and cited no authority for ground three and the Court will grant summary judgment on that ground.

### Legal standard for bad faith

Defendants argue that summary judgment should be entered in their favor on the bad faith claim.  "An insurer acts in bad faith when 'its reasons for denying or delaying payment of the claim are frivolous or unfounded.'"  *Hauff v. Petterson*, 755 F. Supp.2d 1138, 1145 (D.N.M.) (quoting *Sloan v. State Farm Mut. Auto. Ins. Co.*, 85 P.3d 230, 236 (N.M. 2004)).  "A 'frivolous or unfounded' refusal to pay is 'an arbitrary or [a] baseless refusal,' a refusal recklessly lacking any arguable support in the insurance policy or facts of the case.'"  *Id*. (citing *id*. at 236-37).

In *Yumukoglu v. Provident Life & Accident Ins. Co.*, 131 F. Supp.2d 1215 (D.N.M. 2001), the count noted that an unfounded refusal to play a claim

> does not mean "erroneous" or "incorrect"; it means essentially the same thing as "reckless disregard," in which the insurer "*utterly* fail[s] to exercise care for the interests of the insured in denying or delaying payment on an insurance policy." *Jessen v. Nat'l Excess Ins. Co.*, 108 N.M. 625, 628, 776 P.2d 1244, 1247 (1989) (emphasis added).  It means an utter or total lack of foundation for an assertion of nonliability-an arbitrary or [a] baseless refusal to pay, lacking any arguable support in the wording of the insurance policy or the circumstances surround the claim.  It is synonymous with the word with which it is coupled: "frivolous."

131 F.Supp.2d at 1226 (quoting *Jackson Nat'l Life Ins. Co. v. Receconi*, 113 N.M. 403, 419, 827 P.2d 118, 134 (1992)).

The undisputed, material facts indicate that Defendants undertook a  thorough and critical review of Plaintiff's file prior to terminating her benefits.  They noted the inconsistencies between her reported and actual activities; the change in diagnosis from severe cluster headaches and depression to nonspecific neck pain; the change in restrictions from "any activity" to "no repetitive motions or static position;" and the change in life stressors.

In 2009, although she was still taking medication, Plaintiff's  treating physician, Dr. Black, did not include a diagnosis of depression, severe cluster headaches, or post traumatic stress syndrom. Instead, Dr. Black  indicated she had nonspecific neck pain and was only limited from repetitive motion or static position.

The surveillance information was at odds with Plaintiff's self-reporting of her limited daily activities.  Before MetLife terminated the policy,  Plaintiff's file was reviewed by two board-certified physicians and one nurse.  Plaintiff's treating physician refused to respond to repeated inquiries about Plaintiff's medical condition.

The foregoing facts cannot support a finding of bad faith, *i.e.*, an unfounded refusal to pay or continue benefits.   Defendants may or may not have been correct in their assessment of Plaintiff's claimed disability when they terminated benefits, but the termination was not due to bad faith as it is defined in New Mexico. For all of the foregoing reasons, Defendants are entitled to summary judgment on Count II of Plaintiff's Second Amended Complaint.   Whether or not Defendants properly terminated Plaintiff's benefits will be determined in connection with the breach of contract claim.

IT IS THEREFORE ORDERED that Defendant's Motion for Partial Summary Judgment [Doc. 45] is granted.

_____
Hon. Alan C. Torgerson
United States Magistrate Judge

8